**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA**

In re

**JAMES LEE HAYES** and
**JENNIFER LYNN HAYES**,

              Debtors.

Case No. **07-60316-13**

## *MEMORANDUM of DECISION*

At Butte in said District this 7th day of January, 2009.

In this Chapter 13 bankruptcy, after due notice, hearings were held November 4 and 24, 2008, in Butte on the Debtors' Combined Motion for Approval of Bylaws of Water Ski Mania, LLC, and Approval of the Buy/Sell Agreement filed September 16, 2008. The Debtors were represented at the hearings by attorney Gregory W. Duncan of Helena, Montana. In addition, Robert Jardon, Nancy Jardon and Frank Creasia were represented at the hearings by attorney Michael W. Green of Helena, Montana; Amy and Kevin Syvrud (the "Syvruds") appeared *pro se*; Brian and Linda Heeney (the "Heeneys") were represented by attorney William P. Driscoll of Helena, Montana; and Tom and Sue Hanson (the "Hansons"), who filed a written consent to Debtors' combined Motions on September 24, 2008, were represented at the hearings by attorney Charles E. Petaja of Helena, Montana. The Chapter 13 Trustee filed a consent to Debtors' combined Motions on September 18, 2008, and thus did not participate in the hearings. Debtors' Exhibits 1 through 6, 8, and 9 were admitted into evidence without objection as was the Syvruds' Exhibit A. Debtors' Exhibit 27 was admitted into evidence over the objection of the Heeneys,

1

Robert Jardon, Nancy Jardon and Frank Creasia.  Kerry Tolzmann of Wisconsin, Sue Hanson, Patty Rutherford, Tom Hanson, James Lee Hayes, Robert Jardon, Frank Creasia and Merrill Rutherford testified.

Also pending in this case are: (1) the Heeneys' Motion to Strike Hansons' Reply to Objection to Debtors' Combined Motion (dkt no. 163) filed October 31, 2008; (2) the Heeneys' Motion to Strike Hansons' Exhibit and Witnesses (dkt no. 165) filed October 31, 2008; (3) the Heeneys' Motion to Strike Debtors' Reply to Objection to Motion for Approval of Bylaws of Water Ski Mania, LLC, and Approval of the Buy/Sell Agreement (dkt no. 171) filed November 3, 2008; (4) the Heeneys' Motion to Strike Debtors' Witnesses and Exhibits (dkt no. 172) filed November 3, 2008; and (5) Debtors' Motion to Accept Late filings filed November 3, 2008. Because the hearing in this matter was continued from November 4, 2008, to November 24, 2008, the Court finds that the various Motions filed by the Heeneys are moot and will be denied. Also, because the parties have had ample time to review Debtors' exhibits filed October 31, 2008, the Court deems it appropriate to grant Debtors' Motion to Accept Late Filings.

Finally, at the continued hearing held November 24, 2008, counsel for Robert Jardon, Nancy Jardon and Frank Creasia asked that the Court preclude any testimony from Patty Rutherford because Debtors' Amended Witness List was not filed until after the close of business on November 19, 2008, in violation of Mont. LBR 5074-1(b).[1]  In reviewing the docket, the Court notes that Debtors' witness list for the continued November 24, 2008, hearing was filed at

---

[1]  Mont. LBR 5074-1(b) reads in relevant part: "The parties involved in video and in-person conferences and hearings shall exchange proposed witness and exhibit lists and copies of all proposed exhibits, and file such lists and exhibits with the Court, at least three (3) business days prior to a hearing or trial."

2:24 p.m. on November 19, 2008, and Debtors have thus satisfied Mont. LBR 5074-1(b).
Accordingly, the Court allowed Debtors' counsel to call any witnesses listed on the amended list
filed November 19, 2008.

JURISDICTION

The Bankruptcy Code provides a wide range of jurisdiction over property and assets of
the Bankruptcy estate.  Upon the filing of a Bankruptcy petition, an estate is automatically
created which contains all of the legal or equitable interests that the Debtors possess in property
as of the commencement of the Bankruptcy case.  *See* 11 U.S.C. § 541(a)(1).  The Bankruptcy
Court's jurisdiction extends to all property of the Bankruptcy estate, wherever such property is
located.  *See* 11 U.S.C. § 541(a).

Pursuant to 28 U.S.C. § 157(b)(1), Bankruptcy Judges may "hear and determine all cases
under title 11 and all core proceedings arising under title 11, or arising in a case under title 11 ..."
Core proceedings include, but are not limited to: matters concerning the administration of the
estate; orders approving the sale of property of the estate; and other proceedings affecting the
liquidation of the assets of the estate.  *See* 28 U.S.C. § 157(b)(2)(A), (b)(2)(N), and (b)(2)(O).
The Court finds and concludes that the issues presented in Debtors' combined Motion are core
proceedings over which this Court has jurisdiction.

BACKGROUND

As a preliminary matter, the Court would note that it was first exposed to the controversy
among these Debtors, and the members of Water Ski Mania Estates Homeowners Association,
consisting of Brian and Linda Heeney, Edward and Linda Simmons, Frank and Dory Creasia,
Kevin and Amy Syvrud and Robert and Nancy Jardon, in 2007 through related Adversary

3

Proceeding No. 07-00045. Debtors were represented in Adversary Proceeding No. 07-00045 by attorney Gregory W. Duncan, and Water Ski Mania Estates Homeowners Association and its members were represented by attorney Daniel R. Sweeney of Butte, Montana.

At the trial in Adversary Proceeding 07-00045 held September 9, 2007, the parties discussed their respective rights vis-a-vie the Restrictive Covenants and the referenced bylaws of "WATER SKI MANIA." Those same rights are at issue before the Court at this time. In the Adversary Proceeding, after presentation of the Debtor/Plaintiffs' case-in-chief and before the members of WSME were allowed to present any evidence, the Court ruled from the bench that the Restrictive Covenants were not executory. The Court also ruled that "[t]here's an enforcement provision within the covenants, and, certainly, the lake owner under that provision has the right to enforce them because of the way in which it's drafted." The Court's September 9, 2007, oral ruling was followed by a written Memorandum of Decision and Judgment on October 3, 2007. The Judgment read as follows;

> Judgement is entered in favor of the Defendants, in part, and in favor of the Plaintiffs, in part, as follows:
>
> 1. The Restrictive Covenants at issue in this Proceeding are not an executory contract subject to rejection under 11 U.S.C. § 365;
> 2. The landowners' right of first refusal is not a right of last approval, and merely allows the landowners to match the price and terms of any acceptable bona fide offer.
> 3. Commercial use of Serenity Lake by the landowners and/or their guests is expressly forbidden.
> 4. Any unauthorized use of Serenity Lake by the landowners and/or their guests is expressly forbidden.
> 5. The use of Serenity Lake by the landowners for clinics and tournaments is expressly forbidden.
> 6. The Defendants Brian and Linda Heeney shall remove their dock from Serenity Lake on or before March 1, 2008.
> 7. Debtors are the sixth landowner identified in the Restrictive Covenants

4

and as the sixth landowner and as the lakeowner, have the right to enforce the Restrictive Covenants.

On appeal, the Bankruptcy Appellate Panel of the Ninth Circuit ("BAP"), in an unpublished decision filed March 31, 2008, agreed with this Court on the Restrictive Covenant issue, concluding that the "Restrictive Covenants were not executory contracts that could be rejected in Debtors' bankruptcy case."  BAP Case Nos. MT-07-1389-PaDJu and MT-07-0404-PaDJu.  The BAP, however, reversed this Court's ruling on items 2 through 7 of the Judgment finding that those matters were outside the Final Pretrial Order and that the members of WSME were deprived of their due process at trial because "they were given no effective advance notice that this might occur, nor were they afforded an effective opportunity to be heard concerning the issues."[2]  *Id.*

While the foregoing is not necessarily pertinent to the matters now before the Court, Rule 9017, F.R.B.P., provides that the Federal Rules of Evidence apply in cases under the Bankruptcy Code.  It is a commonly-accepted practice to take "judicial notice" of a court's records.  *See* 3 J. Weinstein & M. Berger, WEINSTEIN'S EVIDENCE ¶¶ 201 [03] at 201-35 to -40 (1992).  The practice is particularly useful in bankruptcy litigation in which individual adversary proceedings and contested matters, each of which is procedurally distinct and has its own record, all occur within, and are affected by, the context of the parent bankruptcy case.  *See id.*  For the reason just discussed, this Court concludes that it may take judicial notice of the docket entries and pleadings filed in related Adversary Proceeding No. 07-00045 for the purpose of providing

---

[2]  While items 2 through 7 of the Judgment were not specifically addressed in the "Disputed Factual Issues" or the "Relief Sought" portion of the Final Pretrial Order, the "Hayes Contentions" and the "Defendant's [sic] Contentions", as set forth in the Final Pretrial Order, did raise such matters.

additional background regarding the property at issue and the relationship of the parties. Such facts that have previously been established in the related Adversary Proceeding are not critical to the Court's present ruling, but they do provide context for the Court's instant decision.

## STATEMENT OF FACTS

The Hansons purchased 80 acres of land in 1990, including Lots 8 and 12, as described on COS 460212E, records of Lewis and Clark County. The Hansons built "No Wake Lake," which is not involved here, on the west 40 acres of the property. On the two eastern parcels, consisting of Lots 8 and 12, the Hansons built a water ski lake, referred to as both Serenity Lake and Water Ski Mania, and established a minor subdivision on the east shore of Serenity Lake consisting of five lots described as the Water Ski Mania Estates Minor subdivision ("WSME").

In conjunction with the development of WSME, the Hansons prepared and executed restrictive covenants which were recorded on November 5, 1991 (the "Restrictive Covenants"). The provisions of the Restrictive Covenants that are relevant to this proceeding are as follows:

- The owner or owners of Serenity Lake are referred to as the "Lakeowners" and the owner of any lot in WSME is referred to as a "Landowner".

- An "Association" composed of the Landowners is established to control common property and coordinate other matters of interest to the Landowners.

- "Section VI Lake Use: A unique aspect of landownership in WATER SKI MANIA ESTATES is the lifetime[3] right to use the adjacent body of water presently called Serenity Lake . . . . All decisions concerning the lake will be made by the lakeowner."

- "Section VI.a.  Landowner use of the lake is subject to negotiations between the

---

[3]  Section VI of the Restrictive Covenants uses the term "lifetime" to refer to the duration of the right of the Landowners to use Serenity Lake, but Section VIII provides that the Restrictive Covenants are binding for 30 years and are automatically renewed indefinitely for additional 10-year periods, unless modified by a majority vote of the Landowners.

Association and the Lakeowner, however, landowner use of the lake for water ski activities shall be the primary consideration to the use of the lake except for commercial activities which may be scheduled during the week, and the advance scheduling of water ski tournaments and or clinics which shall be limited to four (4) weekends per year."

• "Section VI.b. Each landowner shall have the right to reserve semi-exclusive use of the lake for a period of time not to exceed two (2) non-consecutive days in any one year. Such semi-exclusive use must be reasonably scheduled in advance and will be granted by the Lakeowner, for such purposes as private parties, class reunions, family gatherings or similar events."

• "Section VI.c. Time frames: Primary consideration for use of the lake shall be for landowner use being 70 hours per week during prime time which is 8 a.m. to 9 p.m. with at least 35 hours being exclusive for landowner use. Business and ski club shall have use of the lake a maximum of 44 hours per week during prime time."

• "Section VI.d. The landowner rights to the use of the lake shall include access to the lake, boat ramp and the common dock."

• "Section VI.e. The landowner shall obtain and keep current sufficient insurance on any water craft they use on the lake to cover his/her liability for the lake structure and accidents thereupon. Landowners shall also assume responsibility for their guests."

• "Section VI.f. A maximum of six (6) landowners shall be allowed the use of the lake. Five (5) landowners shall be owners of lots in WATER SKI MANIA ESTATES and one landowner shall be the owner of a single family dwelling built on property immediately west of the lake."

• "Section VI.i. Landowner's use of the lake is subject to the by laws of WATER SKI MANIA. Should the need arise, such as misuse of the lake facility which would endanger others, or violation of rules and regulations of WATER SKI MANIA the person in violation may lose lake privileges for a period of no less than thirty (30) days for first offence as outlined in the reason for expulsion portion of WATER SKI MANIA by laws and no less than one (1) year for each subsequent violation. Expulsion will require a majority vote of the Association and in case of tie the Lakeowner will decide."

In conjunction with developing Serenity Lake and WSME, the Hansons also operated a ski school and a ski club that were referred to as Water Ski Mania ("WSM").

7

When the Hansons originally designed Serenity Lake, they contemplated that the north end of Serenity Lake would be widened for safety purposes and the Hansons, who eventually wanted to be removed from WSME, designated land on the west side of Serenity Lake as the space for a sixth landowner, who could use the lake under the Restrictive Covenants, and in particular, the 35 exclusive hours referenced in Section VI.c.  However, during construction, the widened portion of Serenity Lake ended up at the south end of the Lake, rather than the north end, but the language in Section VI.f. of the Restrictive Covenants referring to "a single family dwelling built on property immediately west of the lake" was not changed or clarified. Moreover, while the Hansons originally contemplated building their dock on the western shore of Serenity Lake, after the Lake was flipped from north to south, the Hansons built their dock on the southeastern corner of Serenity Lake.

In the beginning, the Hansons resided on Lot 1 of WSME and sold Lots 2 through 5 of WSME between 1991 and 1995.  Patty and Merrill Rutherford were the first people to purchase a lot in WSME from the Hansons.  The Rutherfords lived in their home at WSME from 1992 through 1999.  Patty Rutherford testified that she recalled one instance where the Hansons amended the bylaws of WSM when the Heeneys were looking at purchasing their lot because the Heeneys had an outboard motor on their boat and Brian Heeney was a barefoot skier.  Outboard motors and barefooting were not allowed under the original bylaws of WSM.  There was also testimony that the Hansons amended the bylaws of WSM at some point to allow fireworks, which were prohibited under the earlier bylaws.   The Rutherfords sold their lot to the Creasias in 2000.

In 1996, the Hansons decided to sell Lot 1 and build a new home as contemplated in the

8

Restrictive Covenants.  When the Hansons first started thinking about building a new home, they felt that instead of building their home on the western shore of Serenity Lake, as contemplated in Section VI.f of the Restrictive Covenants, that it would be better to build their new home on the southeastern corner of the Lake because otherwise, while they had retained sufficient property on the west side of the Lake to build their house, it would be too close to the home built by the buyer of the western half of the original 80 acres.  Moreover, the Hansons had already built their dock on the southeastern corner of Serenity Lake and they wanted their home to be in close proximity to their dock.

As a result of the proposed sale of Lot 1 and the intended location change of the site for their home, the Hansons called a meeting of all WSME lot owners.[4]  At the meeting, the Hansons asked the other landowners in WSME for their thoughts regarding the proposed relocation of their house.  As a condition to approving the Hansons' requested relocation of the sixth homesite, the Heeneys asked that the commercial ski usage on Serenity Lake be reduced.[5]  The Hansons, to secure the Heeneys' blessing, agreed to reduce the ski school usage of the Lake from twenty to sixteen hours per week.   All landowners, including the Heeneys, thus gave their oral consent to the Hansons' decision to build their home on the south side of the Lake.

---

[4]  It appears that the other landowners at that time were Rutherfords, Simmons, Heeneys and Lee and Barbara Hutchins.

[5]  The hours of use for Serenity Lake are listed in Section VI.c as between 8 a.m. and 9 p.m.  Thirteen hours per day of ski time multiplied by 7 days in a week equates to 91 hours of ski time.  35 of the 91 hours are set aside for the exclusive use of the 5 landowners in WSME plus a sixth landowner as identified in Section VI.f.  The 5 members of WSME, plus the sixth landowner, are granted an additional 35 hours of use of Serenity Lake, which additional 35 hours are shared with the lakeowner, and the remaining 21 hours are set aside for the exclusive use of the lakeowner.

Some time after the 1996 meeting, the Hansons sold Lot 1 to the Jardons. Also, four of the WSME landowners filed an amendment to the Restrictive Covenants to specify that the Hansons were the sixth landowners who could use the Lake during the 35 exclusive hours referenced in Section VI.c of the Restrictive Covenants. The Heeneys, however, would not agree to a written amendment of the Restrictive Covenants and thus, the amendment was never approved.

The Hansons completed their home on the south side of Serenity Lake in 2002. In April 2002, the Hansons filed an action against WSME seeking a judgment declaring that the Hansons were the sixth landowners under the Restrictive Covenants. All landowners in WSME, except for the Heeneys, filed affidavits indicating that, at the time they purchased their property, they understood that the Hansons were the "sixth landowner" referenced in the Restrictive Covenants, and they approved the relocation of the Hansons' home from the west side to the south side of Serenity Lake. The Heeneys, as owners of Lot 5 in WSME, appeared and opposed the Hansons' request for declaratory relief. Ultimately, the Heeneys were successful in obtaining a summary judgment ruling that because the Restrictive Covenants were a property right, any modification of those rights was subject to compliance with the state statute of frauds, and the Hansons' purported transfer of the sixth lot rights from the west side of Serenity Lake to the southeastern corner of Serenity Lake required execution of a written instrument, or a fully enforceable executed oral agreement, to be enforceable.

The Supreme Court of Montana affirmed the state district court's summary judgment ruling, finding that the transfer of the lake use rights from the western portion of Serenity Lake to the southeastern side of Serenity Lake, as a property right, had to be in writing, or was otherwise

unenforceable. *Hanson v. Water Ski Mania Estates*, 326 Mont. 154, 158, 108 P.3d 481, 484, 2005 MT 47, ¶ 13.  However, the Supreme Court in *Hanson v. Water Ski Mania Estates,* made a point of noting that the "Hansons . . . retained land on the west side of Serenity Lake and [if they] choose to build a single family dwelling there in accordance with WSME covenants, nothing in the District Court's Order of Summary Judgment precludes them from doing so."

Interestingly, the parties agree that Debtors, as purchasers of all the Hansons rights and interests, have the right to use Serenity Lake.  The Hansons' sole purpose in filing the state court declaratory judgment action was to seek a ruling that the Hansons' new home constituted the sixth lot, as identified in the Restrictive Covenants, and that the Hansons could thus use Serenity Lake during the 35 hours per week that is set aside for the exclusive use of the landowners.

The Hansons later sold to Debtors in July of 2004 their remaining interest in lots 8 and 12, excepting therefrom lots 1, 2, 3, 4 and 5 of WSME.  At that time, Debtors acquired the aforementioned interest in lots 8 and 12 (consisting of roughly 27 acres) and the improvements thereon, which included the lake bed, the water in the lake, one domestic water right, two commercial water rights, a home, a dock, and a boat launch.  As previously noted, the Hansons, in conjunction with building Serenity Lake and WSME, developed a business on their property that included a ski school, and the sale of boats and other water ski equipment.  The Hansons also held clinics and water ski tournaments on Serenity Lake.  Hansons' business operations on Serenity Lake were done through WSM.  When Hansons' sold their property to Debtors, the Hansons, on August 30, 2004, cancelled their assumed business name of Water Ski Mania and on that same date, the Debtors organized Water Ski Mania, LLC.  Exhibit 1.  Thus, Water Ski Mania, LLC is the successor to WSM and said entities are separate and distinct from WSME.

11

Debtors originally agreed to pay the Hansons $695,000 for their interest in Lots 8 and 12.  However, after learning of the ongoing conflict between the Hansons and the Heeneys over the Restrictive Covenants, and after Debtors expressed concern about such conflict to the Hansons, the Hansons agreed to reduce the sales price to $645,000 and agreed to carry any amount Debtors could not finance with a lending institution.  The Hansons agreed to sell their property to Debtors at a price below its appraised value because of the ongoing issues with the owners of lots 1 through 5 of WSME, and in particular, the Heeneys.

The evidence shows that the members of WSME have taken actions which have frustrated prior attempts by the Debtors to sell their property.  The Heeneys have made it clear that they will do whatever it takes to frustrate Debtors' efforts to amend or enforce the bylaws that are referenced in paragraph VI.i of the Restrictive Covenants.  The Heeneys have also conducted unauthorized clinics and tournaments on Serenity Lake and in the process, Brian Heeney has held himself out as the owner of Serenity Lake.  The landowners have also invited guests to use Serenity Lake and have refused to pay the guest fees that Debtors claim are due under the bylaws.  The Heeneys have also built a dock adjacent to their property on Serenity Lake that Debtors claim creates a hazard and is not permitted.

The Debtors, unable to sell their property due to the homeowners repeated efforts to thwart any sale of the property and the homeowners' attempts to hobble the Debtors' ability to govern their own property through amendment of the WSM bylaws, were put in a financial predicament that compelled Debtors to seek protection under the Bankruptcy Code on April 4, 2007.  Debtors filed a Third Amended Chapter 13 Plan on September 18, 2007.  Confirmation of Debtors' Third Amended Chapter 13 Plan was opposed by HSBC Bank, USA and the Hansons.

The homeowners of WSME did not oppose confirmation of Debtors' Third Amended Chapter 13 Plan and did not attend the October 2, 2007, confirmation hearing.  Following the confirmation hearing, the Court entered a Memorandum of Decision on December 12, 2007, and an Order on December 16, 2007, overruling the objections of HSBC Bank, USA and the Hansons, and confirmed Debtors Third Amended Chapter 13 Plan.  Debtors' confirmed Chapter 13 Plan specifically provides in paragraph 1:

> The Debtor[s'] real property shall remain property of the bankruptcy estate. Debtor[s] shall employ a professional, subject to the approval of the Bankruptcy Court for the purpose of selling [their] real property. Upon the sale of real property, the Debtor[s] will turn over sufficient funds to pay the following impaired secured claims in order of lien priority. No payment shall be made on these claims until sale of the property. This sale of real property and related fees and costs shall be subject to the approval of the Bankruptcy Court. The Debtor[s] shall actively market the property, sale of the property shall not occur without prior authorization of the Bankruptcy Court and notice to the Creditors, and the Trustee shall be given an opportunity to participate in the closing of the sale.

The success of Debtors' Chapter 13 Plan, and their reorganization, is dependent solely on the sale of Debtors' real property.

As contemplated by Debtors' confirmed Chapter 13 Plan, Debtors now propose to sell their real property to Kerry Tolzmann ("Tolzmann"), who has offered to pay $2 million for Debtors'' property.  The sale of Debtors' real property to Tolzmann would allow Debtors to pay all their creditors in full.  However, Tolzmann's purchase of Debtors' property is contingent upon several things, including, but not limited to:

> Satisfactory resolution of legal challenges to private property owners of property known as Serenity Lake address listed above.  A resolution must specify the uses and (user) conditions, covenants and operating agreements protecting the property owners commercial and non-commercial values being contested by Water Ski Mania Estates (WSME) homeowners before a purchase agreement of any credibility can be reached.

13

[E]nforceable court ordered provisions for property owner redress of value upon failure of WSME to abide by agreed rules and conditions of an Operating Agreement.

The existing legal conditions appear to allow WSME unrestricted access to Serenity Lake resulting in property value loss and interference with Serenity Lake's legal property owners.  Any and all interference with property owner rights must have enforceable conditions or penalties that are clearly defined and can be enforced within a reasonable time.  Prevailing party would be entitled to reasonable legal fees and costs.

The contingent conditions are required for successful purchase agreement between Kerry Tolzmann (Buyer) and Jim, Jennifer Hayes (Seller).

All parties, including the members of WSME ("Landowners"), know that Debtors cannot sell their property to anyone, including Tolzmann, until the bylaw issues are resolved.

DISCUSSION

The evidence in this case shows overwhelmingly that the Landowners, and in particular the Heeneys, have continually and consistently sought to frustrate Debtors' efforts to exercise any type of dominion or control over Serenity Lake.  The actions taken by the Landowners have adversely impacted the Debtors, and have forced Debtors to file the instant Chapter 13 bankruptcy case.  Debtors' original intent was to reject the Restrictive Covenants as an executory contract.  When that effort failed, in another attempt to bring final closure to the dispute with the Landowners, and in particular, the Heeneys, Debtors filed the instant combined Motion seeking approval of Debtors' updated Bylaws, Rules and Regulations for Water Ski Mania Estates Homeowner's Use of Serenity Lake.  Debtors also seek this Court's approval of a sale of Debtors' real property to Tolzmann for the sum of $2,000,000.00.  As set forth in the Buy-Sell Agreement between the Debtors and Tolzmann dated August 8, 2008, the sale of Debtors' property to Tolzmann is contingent upon this Court's approval of Debtors' proposed Bylaws.

14

After carefully considering the testimony and evidence from the November 4th hearing, which was continued to November 24th for the sole purpose of allowing the Landowners, Debtors and the prospective buyer the additional opportunity to negotiate a resolution of the issues, and after considering the arguments of counsel, the issues presented boil down to: (1) whether Debtors were required to bring the present matter to the Court in the form of an Adversary Proceeding; (2) whether the parties should be prohibited from making any mention of the parties' mediation; (3) whether the Debtors, as the owners of WSM, have the authority to unilaterally amend the bylaws of WSM; and (4) if Debtors can unilaterally amend the bylaws, (a) whether the Landowners can conduct commercial activity on Serenity Lake, (b) whether Debtors can restrict the access to Serenity Lake, (c) whether the Landowners are entitled to use the common dock, boat house or Debtors' personal covered dock, (d) whether use of Serenity Lake by the Landowners is limited to water skiing activities only, (e) whether the Lakeowner can limit use of Serenity Lake by the Landowners to a total of 70 hours per week, (f) whether Debtors can limit use of Serenity Lake by the Landowners to April 1st through October 1st, and (g) whether Debtors can charge a guest fee.

1.      Whether Debtors were required to bring the present matter before the Court in the form of an Adversary Proceeding

COLLIERS ON BANKRUPTCY explains that:

[D]isputes that arise in bankruptcy cases can be divided into the following categories,: (1) adversary proceedings, governed by Part VII of the Rules; (2) administrative matters, in which there is no adversary party (for example, an unopposed motion by a trustee to sell property of the estate); and (3) contested matters, which do not qualify as adversary proceedings because they are not included in the Rule 7001 list.  Contested matters resemble adversary proceedings in that there are (at least) two parties who are opposing each other with respect to relief sought by one of them.

* * *

> Occasionally, a party who should have commenced an adversary proceeding may instead file a motion under Rule 9014. In such cases, so long as due process has been afforded to the responding party, the courts will apply the harmless error rule and not force the parties to start all over again.

10 COLLIER ON BANKRUPTCY, ¶ 9014.01, p.9014-2-3 (15th ed. rev.). In this case, Debtors'

combined Motion was filed on September 16, 2008, and when the Jardons and Frank Creasia

filed their opposition to Debtors' combined Motion on September 26, 2008, it was the Jardons

and Frank Creasia, through counsel, who scheduled the matter for hearing on November 4, 2008.

The Heeneys, through counsel, followed suit on that same date when they filed their opposition

to Debtors' combined Motion and similarly set the matter for hearing on November 4, 2008.

After picking the date the matter would be heard, none of the members of WSME made any

effort to continue the November 4, 2008, hearing.

> COLLIERS also continues in ¶ 9014.05:

> However, due process must still be afforded to all parties in a dispute whether that dispute is classified as an adversary proceeding or a contested matter. This is why Rule 9014 makes certain of the rules in Part VII applicable to contested matters. Absent direction otherwise by the court, the rule incorporates the Part VII rules respecting pleading special matters, real parties in interest, infants and incompetent persons, capacity, misjoinder, nonjoinder and substitution of parties, discovery, depositions, interrogatories, perpetuation of testimony, production of documents, requests for admissions, sanctions for discovery abuses, dismissals, consolidation and separate trials, findings, judgments, default, summary judgment, seizure, execution, and process on behalf of non-parties for application in those contested matters governed by the rule.

> In addition to scheduling the matters for hearing, and then failing to request a

continuance, the members of WSME also made no effort to have the provisions of F.R.B.P.

7016, 7026, or 9019 apply to the matters now before the Court. Mont. LBR 9014-1 provides that

16

"[u]pon the request of any party, the Court, in its discretion, will determine whether the provisions of F.R.B.P. 7016, 7026, 9019 and any other rules should apply to any contested matter, given the facts and the issues alleged in such matter."

The Court holds that in a contested matter, the various discovery provisions of the Federal Rules of Civil Procedure clearly apply.  However, this Court has steadfastly required that parties adhere to Mont. LBR 9014-1, which requires that the parties first secure a decision from this Court that the Federal Rules of Civil Procedure are applicable.  As just noted, the members of WSME made no attempt to apply the Federal Rules of Civil Procedure to the contested matter now before the Court.  For the reasons discussed above, the Court finds that all parties were afforded due process and the Court applies the harmless error rule discussed in 10 COLLIER ON BANKRUPTCY, ¶ 9014.01, and declines to force the parties to start all over again.  In sum, the matters presented by Debtors' Combined Motion for Approval of Bylaws of Water Ski Mania, LLC and Approval of the Buy/Sell Agreement, as a condition to the success of Debtors' confirmed Chapter 13 Plan, are ripe for decision under Rule 9014 as a contested matter.

The Court would note that virtually every Exhibit presented at the hearings held November 4th and 24th was exchanged by the parties prior to the September 7, 2007, trial in related Adversary Proceeding No. 07-00045.  Moreover, several of the key witnesses have testified previously before this Court.  As Debtors' counsel correctly noted at the hearings, the Landowners have not been bamboozled by the instant proceeding but rather, are crying foul in yet another attempt to further delay a final and definitive ruling on whether Debtors can amend and enforce the rules governing use of Serenity Lake by the Landowners.

2.      Whether the Debtors should be prohibited from making any mention of the fact

17

that the parties engaged in mediation.

This question should require a one word answer, namely "No", but the Court feels compelled to elaborate because at the hearings held November 4th and 24th, certain members of WSME made quite a fuss when Debtors and their counsel referenced a mediation held June 10, 2008. On March 28, 2008, Debtors filed a Motion to Sell, seeking at that time to sell their real property to Tolzmann. Thereafter, on April 2, 2008, Debtors filed a "Notice to the Court of Presenting Bylaws." Both matters were scheduled for hearing on May 13, 2008. At the May 13, 2008, hearing, Debtors appeared at the hearing personally and with their counsel of record, Gregory W. Duncan. Opposing landowners Robert and Nancy Jardon appeared at the hearing with their counsel, Michael W. Green; opposing landowners Linda Heeney, Frank Creasia, Kevin and Amy Syvrud and Edward and Linda Simmons appeared at the hearing with their counsel, Daniel R. Sweeney; and the Hansons appeared with their counsel, Charles E. Petaja, while secured creditor Americas Servicing Company was represented by attorney John Grant of Helena, Montana. At that hearing, Debtors withdrew their proposed bylaws and asked that the Court allow the parties an opportunity to mediate their dispute concerning the bylaws. Debtors, the members of WSME and the Hansons participated in a mediation held June 10, 2008, in Butte. That mediation was confidential and the Court was not privy to those proceedings, other than the fact that it is clear the parties did not resolve their dispute through mediation as the parties are now before the Court litigating the matter.

The Court agrees with the members of WSME that none of the parties should be allowed to discuss any particular aspect of the mediation. However, the Court finds it a bit disingenuous for the members of WSME to object to any mention of the mediation. The parties appeared

18

before this Court on May 13, 2008, and asked that they be allowed to mediate their dispute.  This

Court's Order of May 13, 2008, specifically granted the parties permission to mediate their

dispute and thus, this Court is fully aware that a mediation occurred.  Therefore, no prejudice has

occurred to the members of WSME when the Debtors make general reference to the mediation.

      3.      Whether the Debtors, as the owners of Serenity Lake and WSM, have the
authority to unilaterally amend the rules and regulations governing Landowner use
of Serenity Lake.

As the Court embarks upon resolution of this dispositive question, one must look at the

overall larger picture.  Although Brian Heeney would like to believe that he is the owner of

Serenity Lake, it is undisputed and the evidence shows that Debtors own lots 8 and 12, as shown

on the Amended Certificate of Survey filed under document number 460212/E records of Lewis

and Clark County, Montana, excepting therefrom, that property depicted on Certificate of Survey

Document number 477972/E, records of Lewis and Clark County, Montana (consisting of Lots 1,

2, 3, 4 and 5 of WSME).  Debtors also own the improvements on their remainder interest in Lots

8 and 12, which consists of roughly 27 acres, including the Debtors' home, Serenity Lake--

including the lake bed and the water in the lake--one domestic water right, two commercial water

rights, a dock, and a boat launch.  Debtors also own the right to use the name Water Ski Mania.

In addition to the fact that Debtors own Serenity Lake, when the Hansons developed

WSME, as an enticement to get people to buy the lots therein, the Hansons granted the

purchasers of Lots 1 through 5 of WSME the right to water ski on Serenity Lake for a period of

70 hours per week between the hours of 8 a.m. and 9 p.m.  The right of the Landowners to water

ski on Serenity Lake is a property right that runs with the particular lots in WSME by virtue of

the Restrictive Covenants, and while the Restrictive Covenants allow the Landowners to water

ski on Serenity Lake during certain hours of the week, the Restrictive Covenants do not preclude the Lakeowner from controlling, with stated limitations, his or her own property.

In an argument that defies common sense when taken to its logical conclusion, the Landowners, relying on the first sentence of Section VI.a., which reads, "Landowner use of the lake is subject to negotiations between the Association and the Lakeowner," argue that Debtors are precluded from making any decision with respect Serenity Lake unless all the Landowners agree.  The Court agrees that use of Serenity Lake by the Landowners is subject to negotiations but the Landowners do not own Serenity Lake and they do not have the right to unilaterally strip the Debtors of essentially all their property rights, which is clearly the desire of at least the Heeneys.

The negotiation language has come in to play on several occasions.  For example, the Hansons, upon request of Brian Heeney, amended the bylaws of WSM to permit outboard motors and barefoot skiing.  Robert Jardon also testified that he recalled attending meetings with the Hansons and negotiating changes to the bylaws.  Contrary to the Landowners' crabbed interpretation of the Restrictive Covenants, the first sentence of Section VI.a. is consistent with the last sentence of the first paragraph of Section VI, which provides that "[a]ll decisions concerning the lake will be made by the lakeowner."  Originally the Hansons, and now the Debtors, retain the exclusive right to use and control their own real property, which includes Serenity Lake, in any manner they see fit, subject to the limited rights that were conveyed to the Landowners via the Restrictive Covenants.  The Landowners, through the Restrictive Covenants have the right to make suggestions and requests to the Lakeowner concerning Landowner use of Serenity Lake, which suggestions and requests are subject to negotiation.  But in the end, it is the

20

Lakeowner who ultimately makes any and all decisions concerning the use of Serenity Lake, provided such decisions do not restrict the rights granted the Landowners in the Restrictive Covenants. The Lakeowner's decisions concerning the rules and regulations governing the Landowners' use of Serenity Lake are done through Section VI.i of the Restrictive Covenants and a document referred to as the "by laws of" WSM.

The Landowners, not surprisingly, argue that the "by laws" of WSM are not binding upon the Landowners but rather, constitute the internal operating agreement of WSM. The Court would agree that the term "bylaws" generally refers to the rules or regulations adopted by an association or corporation to govern its internal operations. However, as Black's Law Dictionary points out, the term is sometimes used to designate local laws that are commonly referred to as ordinances. An "ordinance" is a "rule established by authority[.]" In this case, it is clear that WSM is the "authority" that is charged with establishing the laws that govern the use of Serenity Lake. WSM is under the sole control and direction of the Debtors. Any laws, rules or regulations that Debtors adopt with respect to Serenity Lake, through WSM, do apply to the Landowners, provided such laws, rules or regulations are consistent with the Restrictive Covenants.

Given this Court's finding that Debtors can unilaterally amend the rules and regulations governing the Landowners' use of Serenity Lake, the next question raised by the parties is whether the Restrictive Covenants permit the Landowners to conduct commercial activity on Serenity Lake. The answer to such question is a resounding no.

On November 4th, the Court asked all the parties whether there was any disagreement that only the Debtors could conduct commercial activity on Serenity Lake. Interestingly, the Heeneys

were the only persons at the hearing who thought that the Landowners could conduct commercial activity on Serenity Lake.  Serenity Lake is not part of the WSME.  Rather, the Restrictive Covenants grant the landowners limited use of Serenity Lake.  Specifically, the landowners are granted 70 hours of use of Serenity Lake per week.  Additionally, each landowner is entitled to semi-exclusive use of Serenity Lake for two non-consecutive days during a calendar year for such events as private parties, class reunions, family gatherings or similar events.[6]  The delineated events are all private, as opposed to commercial, and the use of Serenity Lake for such private events is clearly limited to two days per year per landowner.  A landowner's use of Serenity Lake–limited to the particular uses delineated above–may be usurped by the lakeowner for commercial activities during the week and for four weekends during the year for water ski tournaments and/or clinics.

The Landowners' right to water ski on Serenity Lake is protected by a provision in the Restrictive Covenants that limits the Lakeowners' use of the property for business and ski club purposes to 44 hours per week during the hours of 8:00 a.m. to 9:00 p.m., and by a provision that limits the Lakeowners use of Serenity Lake for water ski tournaments and clinics to four weekends per year.  The use of Serenity Lake by the Landowners and the Lakeowner is clearly drafted in such a fashion to protect the Lakeowners' exclusive use of Serenity Lake for commercial purposes.  Any commercial use of Serenity Lake by the Landowners, including the sponsoring of water ski tournaments or clinics is expressly precluded.

--------

[6] Under the doctrine of ejusdem generis, "where an enumeration of specific things is followed by some more general word or phrase, such general phrase is to be held to refer to things of the same kind as those enumerated."  *Aleksich v. Industrial Accident Fund*, 116 Mont. 127, 151 P.2d 1016 (1944).  None of the enumerated activities in the Restrictive Covenants suggest that the Landowners have any right to conduct commercial activity on Serenity Lake.

The next issue is whether Debtors can restrict the Landowners' access to Serenity Lake. Section VI.d of the Restrictive Covenants provides that the Landowners' "rights to use of the lake shall include access to the lake, boat ramp and the common dock." The Restrictive Covenants were clearly drafted in such a fashion so as to grant the Landowners safe access to Serenity Lake while at the same time allowing the Lakeowner to control and protect the Lakeowner's private property. The Court thus concludes that the Lakeowner can limit the Landowners' access to Serenity Lake to the area around the boat ramp and the common dock, unless a Landowner's property touches Serenity Lake. In that instance, a Landowner can access Serenity Lake at the point where the Landowner's lot and Serenity Lake touch, without having to trespass across the Lakeowner's private property.

The Restrictive Covenants clearly provide the Landowners access to the "common dock." However, the Restrictive Covenants make no reference to any use by the Landowners of Debtors' personal covered dock and the Court concludes that the Landowners are not entitled to use Debtors' personal covered dock without Debtors' permission. Similarly, the Restrictive Covenants do not require that the Landowners have access to the boat house, which from the testimony, is separate from both the existing common dock and Debtors' personal covered dock. Section VI.d of the Restrictive Covenants allows the Landowners to use the boat ramp and the common dock. Such Section makes no reference to the Landowners' use of any other structures on or around Serenity Lake. Accordingly, as long as the Landowners have access to a common dock, the Lakeowner may deny the Landowners access to the boat house, even though Landowners may have historically used the boat house.

The Lakeowner also has the right under the Restrictive Covenants to limit the use of

23

Serenity Lake to water skiing activities only.  The Landowners argue that they are entitled under the Restrictive Covenants to use Serenity Lake for ice skating, swimming, canoeing, and other such activities.  Water skiing is the primary stated use of Serenity Lake and the Court can envision reasons why other activities would be prohibited.  Tom Hanson testified that the ski boats on Serenity Lake travel at quite high speeds and according to Robert Jardon, Serenity Lake is only about 250 feet wide.  The Debtors, as owners of Serenity Lake, certainly have good reason to prohibit swimming and other activities on Serenity Lake between the hours of 8 a.m. and 9:00 p.m., when water skiing may be taking place either by the Landowners or the Lakeowners.  In fact, swimming, canoeing and other such activities would seem more appropriate for a lake such as adjacent No Wake Lake, which presumably does not allow motor boats.  Likewise, the Court can envision safety reasons why the Debtors would want to prohibit winter activities on Serenity Lake.  The bottom line is that Serenity Lake is an extremely shallow, long and narrow body of water that was developed specifically for water skiing purposes.

In sum, the Restrictive Covenants limit the Landowners' use of Serenity Lake to a total of 70 hours per week for water skiing purposes.  Any other purpose simply is not permitted, unless so authorized by the bylaws of WSM.[7]  In addition, the Debtors have the sole right to dictate the times when the Landowners can use Serenity Lake, provided the Lakeowner provides the Landowners 70 hours to water ski on Serenity Lake between the hours of 8:00 a.m. and 9:00 p.m, in a one week period.

The issue of whether Debtors can limit use of Serenity Lake by the Landowners to the

---

[7]  Debtors' proposed bylaws permit waterskiing, barefooting, wakeboarding, wake skating, wake surfing, knee boarding, towing water toys and swimming at the common dock.

period of time between April 1st through October 1st is more problematic.  Robert Jardon testified

that he has skied as early as March 17th, but such date appears to be the earliest that the parties

have water skied on Serenity Lake.  Robert Jardon also testified that although Serenity Lake

normally freezes anywhere from mid-November to late December, he has seen waterskiing on

Serenity Lake as late as Thanksgiving.  Robert Jardon did note though that Serenity Lake can

freeze overnight and the Hansons always lowered the level of water in Serenity Lake during the

winter months to prevent damage to the docks caused by ice.

 Although no testimony exists in the record as to why Debtors picked the specific dates of

April 1 and October 1, it is logical, and certainly not prohibited, for Debtors to set dates certain

for when Serenity Lake would be ready and available for water skiing.  For instance, the

Lakeowner may have insurance, similar to that obtained by ski resorts, that starts and stops on set

dates.  In addition, the Lakeowner may not always live on the premises, but may hire someone to

operate the water ski lake during the summer months.  Finally, the Lakeowner will most certainly

want the water level of the Lake dropped by a certain date in the fall to prevent ice damage to the

docks and will want to keep the water level at the lower level until a date late enough in the

spring to ensure the lake does not freeze while at the higher level maintained for water skiing.

For the reasons just discussed, the Court concludes that Debtors' chosen dates of April 1st and

October 1st are reasonable and do not violate the Restrictive Covenants.

 Along these lines, it is imperative that the Lakeowner maintain the water in Serenity Lake

at a safe level for water skiing between the dates of April 1st and October 1st.[8]  Prior testimony

---

 [8]  Robert Jardon testified that Serenity Lake is only about 36 inches deep when at full
pool.  If the water level drops much below 36 inches, it is simply too dangerous for the parties to
ski.

suggests that Debtors may not have maintained the water level at its historical level, which level was deemed safe by all the parties for waterskiing, prompting the Court to direct in its May 13, 2008, Order that "Debtors shall maintain the level of Serenity Lake at its historical levels, having exclusive control over the switch and the source of water."

The Landowners argue that they are entitled to let guests use Serenity Lake at no charge. The Restrictive Covenants only provide in Section VI.e that "Landowners shall . . . assume responsibility for their guests."  Such sentence does not preclude regulation by the Lakeowner of use of the Lake by guests of the Landowners.  In fact, use of Serenity Lake by the Landowners is tied to ownership of a lot in WSME.  Guests are undoubtedly people who do not have an ownership interest in a lot in WSME and thus, it is reasonable for Debtors to regulate use of Serenity Lake by guests and it is equally reasonable for Debtors to charge a reasonable fee for use of Serenity Lake by guests to help with the operating costs.  Indeed, Exhibit 4, a copy of the "By Laws and Rules and Regulations" of WSM dated August 1, 2000, show that the Hansons had a detailed guest policy, and charged a guest fee of "$4.00 per set for club boat" and "$2.00 per set for landowner/member boat."  In addition, as far as rotations, "<u>One</u> lot or membership equals <u>one</u> rotation.  Example: If Tom brings a guest, he will only enter his name on the board and not his guest's name.  When Tom's turn is next, he can either ski himself or allow his guest to ski."  The By Laws and Rules and Regulations dated May 1, 2002, Exhibit 5, contain identical language regarding use of Serenity Lake by guests.

The bylaws proposed by Debtors define a guest as anyone other than a legally dependant child but go on to state that "imagery of a golf course community can guide one's understanding of the Restrictive Covenants and Bylaws, Rules, and Regulations."  Debtors, through the

26

proposed bylaws, then purport to limit guest use of Serenity Lake to a Landowners' semi-exclusive days. Debtors' proposal would effectively preclude a Landowner's adult children, grandchildren and other similar persons from using Serenity Lake all but two days out of the year. That is certainly not what would happen if one was living on a golf course. Rather, members of a golf community can generally bring guests, provided they pay the applicable fee. The Court concludes that Debtors' newly proposed guest policy is unreasonable and not consistent with the letter and spirit of the Restrictive Covenants. As was done in 2000 and 2002, Debtors have the right to regulate use of Serenity Lake by guests and they may charge a reasonable guest fee for use of Serenity Lake, but it simply is not proper for Debtors to limit use of Serenity Lake by a Landowner's guests to 2 days per year. Debtors' bylaws must, therefore, be redrafted to accommodate more reasonable use of Serenity Lake by guests.

In addition to using Serenity Lake for water skiing purposes, the record shows that the Heeneys have built a dock on Serenity Lake. Debtors' proposed bylaws provide that "[t]here are no common areas other then [sic] the common dock. No other dock is to be used." Nowhere is the installation of a dock mentioned in the Heeney's Warranty Deed and the building of a private dock is clearly not authorized by the Restrictive Covenants. The Restrictive Covenants specifically provide for a common dock in Section VI.d, but make no mention of private docks. While the Hansons may have failed in their attempt to move the location of the sixth landowner lot due to the Heeneys' efforts, the Heeneys desire to have a private dock on Serenity Lake succumbs to the same shortfall as the Hansons experienced in *Hanson v. Water Ski Mania Estates*, 326 Mont. 154, 108 P.3d 481, 2005 MT 47, requiring that such an addition to the Restrictive Covenants be in writing. Any agreement that the Heeneys may have had with the

27

Hansons to install a portable dock at an agreed location is null and void because such agreement did not survive the signing and recordation of the deed.

Debtors also assert that they have approached the landowners about imposing an assessment as permitted by Sections V and VI.h of the Restrictive Covenants and the landowners have flatly refused to agree to any assessment.  As explained by the Supreme Court of the State of Montana in *Kennedy v. Dawson*, 296 Mont. 430, 440. 989 P.2d 390, 396-97, 1999 MT 265, ¶ 42 (Mont. 1999):

> "[E]very contract, regardless of type, contains an implied covenant of good faith and fair dealing." *Story v. City of Bozeman* (199, 242 Mont. 436, 450, 791 P.2d 767, 775. The Montana Legislature has set forth the standard of conduct required by the implied covenant of good faith and fair dealing: "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." § 28-1-211, MCA. "Each party to a contract has a justified expectation that the other will act in a reasonable manner...." *Story,* 242 Mont. at 450, 791 P.2d at 775.

The landowners, in refusing to agree to any assessment, are failing to abide by the implied covenant of good faith and fair dealing.  Testimony heard at prior hearings suggests that other persons similarly situated to the landowners in this case pay substantial fees to ski on a lake such as Serenity Lake and this Court finds it quite reasonable that the Landowners in this case should pay their fair share of the insurance, taxes and repair and maintenance costs associated with maintaining the water level in Serenity Lake and in keeping the Lake, the boat ramp and the common dock in a safe, well-maintained, working condition.  The Landowners' continued refusal to pay their fair share for the maintenance and operation of Serenity Lake may indeed be a violation of MONT. CODE ANN. § 1-3-212 wherein a "person who receives the benefit shall bear the burden."

On this point, Section II recites that the "herein described property shall be used for single

28

family dwelling purposes." Consistent with the above language pertaining to the 5 primary lot owners in WSME is the language in Section VI.f which defines the sixth lot owner as "the owner of a single family dwelling built on property immediately west of the lake." Tom Hanson testified that many of the original owners of Lots 2 through 5 owned their lots for numerous years before they built a home. The original purchasers of Lots 2 through 5 used Serenity Lake during the period of time when no homes were built on their lots. Debtors own the land immediately to the west of Serenity Lake and it is undisputed that Debtors could build a home on that property if they so desired. As a result, Debtors are the sixth owner identified in the Restrictive Covenants. The sixth lot has been identified as a single family dwelling lot and nothing in the Restrictive Covenants requires that a home be built before a landowner may enforce his or her rights under the Restrictive Covenants, particularly in light of the fact that no time limit was set for any landowner to build on their lot. Debtors, therefore, have the right to seek enforcement of each and every provision in the Restrictive Covenants. Moreover, the Court also ruled at the September 7, 2007, hearing that Debtors, as the lakeowners, have the right to enforce the Restrictive Covenants.

The time is now for the Landowners' persistent, vituperative and intemperate attacks on the Debtors to end and for all parties to act in a reasonable manner. As set forth in the preamble of the Restrictive Covenants, "Do unto others, as you would have them do unto you."

Finally, the Landowners take issue with Debtors' proposed legal fee provision which reads:

> Landowners in WSME are to pay all reasonable legal and attorney costs for both
> sides if there is a breach of Restrictive Covenants and/or Bylaws. This includes
> but is not limited to, trespassing, vandalism, out of hours use, underage use, non-

registered use, unsafe use, harassment of lake owners commercial rights, and any
and all other restrictive covenant or Bylaws issues.

The Court agrees with the Landowners that such provision is not consistent with Montana

law, which provides:

> Whenever, by virtue of the provisions of any contract or obligation in the nature
> of a contract made and entered into at any time after July 1, 1971, one party to
> such contract or obligation has an express right to recover attorney fees from any
> other party to the contract or obligation in the event the party having that right
> shall bring an action upon the contract or obligation, then in any action on such
> contract or obligation all parties to the contract or obligation shall be deemed to
> have the same right to recover attorney fees and the prevailing party in any such
> action, whether by virtue of the express contractual right or by virtue of this
> section, shall be entitled to recover his reasonable attorney fees from the losing
> party or parties.

MONT. CODE ANN. § 28-3-704.  Under Debtors' proposed attorney fee provision, the prevailing

party, whether it be the Lakeowner or the Landowners, would be entitled to recover his or her

reasonable attorney fees from the losing party.  *See Chase v. Bearpaw Ranch Ass'n*, 2006 MT 67,

331 Mont. 421, 133 P.3d 190.  As set forth above, while Debtors' proposed attorney fee provision

is not consistent with Montana law, it is governed by Montana law and any prevailing party

would be awarded its fees and costs.  Thus, such provision is not fatal but should be amended to

be consistent with MONT. CODE ANN. § 28-3-704.

In accordance with this Memorandum of Decision, the Court will enter a separate Order

providing as follows,

IT IS ORDERED:

(1) Brian and Linda Heeney's Motion to Strike Hansons' Reply to Objection to Debtors'

Combined Motion filed October 31, 2008, is DENIED;

(2)  Brian and Linda Heeney's Motion to Strike Hansons' Exhibit and Witness filed

October 31, 2008, is DENIED;

     (3)  Brian and Linda Heeney's Motion to Strike Debtors' Reply to Objection to Motion for Approval of Bylaws of Water Ski Mania, LLC, and Approval of the Buy/Sell Agreement filed November 3, 2008, is DENIED;

     (4)  Brian and Linda Heeney's Motion to Strike Debtors' Witnesses and Exhibits filed November 3, 2008, is DENIED;

     (5)  Debtors' Motion to Accept Late filings filed November 3, 2008, is GRANTED;

     (6) Consistent with the Memorandum of Decision contemporaneously issued with this Order, Debtors' Motion for Approval of Bylaws of Water Ski Mania, LLC, filed September 16, 2008, is DENIED, in part, as to the guest policy and the attorney fee provision, and Debtors shall amend their guest policy and the attorney fee provision accordingly, and Debtors' Motion for Approval of Bylaws is GRANTED, in part, as the Bylaws, except as to the guest policy and the attorney fee provision, are approved in all other respects; and

     (7) Debtors' Motion for Approval of the Buy/Sell Agreement filed September 16, 2008, is GRANTED, with the provision that upon verbal agreement by Tolzmann, the appraisal contingency on page 4 is stricken from the August 2008 Buy-Sell Agreement.

BY THE COURT

_Ralph B. Kirscher_

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana